CHARLES M. McGEE and RUTH J. McGEE, Appellants, v. WABASH RAILROAD COMPANY.

Division One, November 25, 1908.

1. **CONTRIBUTORY NEGLIGENCE:** Question for Jury. If there is any evidence at all tending to establish the defense of contributory negligence, the court is not authorized to give a peremptory instruction for defendant, for then the question is one for the jury.

2. **NEGLIGENCE:** Speed at Crossings. It is not negligence for passenger trains to run at a rapid speed over road crossings in

the country, between stations, away from congested populations. The Legislature can easily establish a rule regulating train speed at country crossings, but it has not done so.

3. ———: Humanitarian Doctrine: Country Crossing: Not Stopping Train. There is no room for the application of the last clear chance doctrine, where the boy was in the act of crossing the track at a country road crossing, and had almost reached the further rail when first seen or could have been seen by the engineer of the passenger train then only fifty feet distant and running fifty miles an hour. It being impossible to stop the train inside of several hundred feet and the train running more than fifty feet per second, an emergency brake or the distress whistle would not have avoided the accident.

4. ———: ———: ———: ———: Could Have Been Seen by Fireman. And the fact that the fireman could have seen the boy three or four hundred feet away does not make a case for the jury, on the humanitarian doctrine. The fireman has manifold duties to perform and he is not required to glue his eye to the track at every instant, and unless the evidence shows that he did see the child in peril of the rapidly oncoming train, the company cannot be held to have been negligent on the theory that he might have seen and caused the train to be slowed down or brought to a standstill; and if he did see the boy in peril five or six seconds before the crossing was reached, it would be to indulge in mere conjecture to speculate that in that time he could have communicated his observations to the engineer and that the engineer, comprehending the communicated information, could have seized the appliances and stopped or slowed down the train, all within five or six seconds.

5. ———: Plaintiff's Burden: No Signals. Where the boy was killed at a country crossing and there is substantial evidence that the crossing signals required by the statute were not given, plaintiff is not required to show by direct or inferential evidence that the failure to give those signals was the proximate cause of the injury. There being substantial evidence that the signals were not given, the statute raises the presumption that the injury was the result of disobedience thereto, and puts the burden on defendant to show that the failure to give the signals did not cause the injury.

6. ———: ———: ———: Plaintiff's Contradictory Witnesses. It cannot be assumed, in passing on a peremptory instruction for defendant, that, because the engineer, called by plaintiff, testified that the crossing signals were given, there was no substantial evidence to show that they were not given, if other witnesses testified they were not given. The mandatory in-

McGee v. Railroad.

struction to find for defendant cannot be justified on the en-
gineer's testimony alone, though he was plaintiff's witness; it
is for the jury to settle the conflict between plaintiff's wit-
nesses.

7. ————: Burden on Defendant: How Established: Neither
Looking Nor Listening.    Defendant, in carrying the burden
of showing that a failure to give the statutory signals did not
cause the injury, need not introduce testimony of its own, but
such fact may appear from plaintiff's proof. If plaintiff's un-
contradicted eye-witness testifies that the injured party in broad
daylight walked upon defendant's railroad track at a country
crossing, before a rapidly approaching passenger train, without
looking or listening, when to look was to see and to listen was
to hear, and such injured person was an adult, the fact is
thereby established that the failure to give the signals was
not the proximate cause of the injury, but his conduct was
negligence and bars a recovery.

8. ————: ————: ————: ————: Child Thirteen Years Old.
The boy was thirteen years old, of bright intelligence, free
from any impediment, and lived near the country railroad
crossing, and the railroad was a single track, and there was
no confusion of tracks, switches or circumstances to mislead.
*Held*, that, the facts being few and free from confusion and
the danger to be avoided within the easy comprehension of
a boy of that age, the court did not err in assuming as a matter
of law that he was guilty of contributory negligence in attempt-
ing, without looking or listening, to cross the railroad track in
front of the approaching train.

*Held*, by WOODSON, J., dissenting, that under the most favorable
light to defendant, the boy could not have seen the train
until he was within six feet of the track, and could not have
walked more than nine feet after the train came in sight,
and the hill which obscured his view muffled its sound, and
to hold as a matter of law that a boy thirteen years old was
guilty of such contributory negligence as bars plaintiff's re-
covery, in attempting amid such circumstances to cross the
track without looking or listening, when no signal was given,
is to carry the doctrine to an extreme.

Appeal from Daviess Circuit Court.—*Hon. J. W.
Alexander*, Judge.

AFFIRMED.

*E. M. Harber* and *J. A. Selby* for appellants.

(1)   The evidence was abundant to establish defendant's failure to comply with the provisions of section 1102, Revised Statutes 1899.   This made a prima-facie case against defendant requiring the submission thereof to the jury even if deceased had been an adult instead of a thirteen-year-old child.   Huckshold v. Railroad, 90 Mo. 548; Crumpley v. Railroad, 111 Mo. 152; Lane v. Railroad, 132 Mo. 4; Atterbury v. Railroad, 110 Mo. App. 608; Green v. Railroad, 192 Mo. 131; Smith v. Railroad, 19 Mo. App. 120; McNulty v. Railroad, 203 Mo. 475; Lange v. Railroad, 106 S. W. 665.   (2)   (a)   The plaintiffs' child, thirteen years and one month old at the time of his death, was required to exercise such care and such care only as a child of like age and intelligence would have used under like circumstances, and whether he used such care was for the jury.   Boland v. Railroad, 36 Mo. 484; O'Flaherty v. Railroad, 45 Mo. 70; Ostertag v. Railroad, 64 Mo. 421; McCarthy v. Railroad, 92 Mo. 536; Eswin v. Railroad, 96 Mo. 290; Williams v. Railroad, 96 Mo. 275; Dlauhi v. Railroad, 105 Mo. 645; Spillane v. Railroad, 111 Mo. 555; Burger v. Railroad, 112 Mo. 238; Schmitz v. Railroad, 119 Mo. 256; Payne v. Railroad, 129 Mo. 405; Spillane v. Railroad, 135 Mo. 414; Ruschenberg v. Railroad, 161 Mo. 70; Anderson v. Railroad, 161 Mo. 411; Van Natta v. Railroad, 133 Mo. 13; Campbell v. Railroad, 175 Mo. 161; Woods v. Railroad, 188 Mo. 229; Holmes v. Railroad, 190 Mo. 98; Lange v. Railroad, 106 S. W. 660; Duffy v. Railroad, 19 Mo. App. 380; Gass v. Railroad, 57 Mo. App. 574; Frye v. Railroad, 111 Mo. App. 324.   (b)   Indeed, it may be conceded, which we by no means do, that the act of this child, when measured by the standard applied to an adult person of ordinary prudence, was negligent, yet this would by no means deprive these plaintiffs of the right to have the jury pass upon the

question as to whether or not such an act was negligent in this child. Burger v. Railroad, 112 Mo. 249; Ruschenburg v. Railroad, 161 Mo. 86; Payne v. Railroad, 129 Mo. 405; Spillane v. Railroad, 111 Mo. 555; Holmes v. Railroad, 190 Mo. 98; Frye v. Railroad, 111 Mo. App. 324; Railroad v. Gladmon, 15 Wall. 401. (3) It is shown by the testimony of engineer Carter that the train killing plaintiffs' child was running at the time it struck this crossing from fifty to fifty-five miles per hour; that he could have seen this crossing when the train was within fifty feet thereof; that the fireman could have seen the crossing when three hundred or four hundred feet distant from it; that he, Carter, did not see the boy at all before he was struck; that when struck he was near the west rail; that one more step and he would have got over; that if even the service application of air had been applied when the fireman first saw or might have seen this child it would have reduced the speed of the train before reaching the crossing one-half. In other words, it is shown that had these employees in charge of this engine been, as the law exacts they should, when approaching such dangerous crossing at such furious rate of speed, where the public has equal rights, on vigilant watch and lookout to prevent such catastrophes as this, the death of this child could have been avoided, and the law exacts that they both, engineer and fireman, should have observed under the circumstance in proof the perilous condition of deceased at the earliest opportunity presented therefor, and that after his position might have been known, if his injury and death could have been averted, and it clearly appears in the evidence of engineer Carter it could, the defendant is liable, and the case could well have been submitted to the jury upon this issue. Livingston v. Railroad, 170 Mo. 452; Hinzeman v. Railroad, 182 Mo. 611; Murray v. Railroad, 108 Mo. App. 501; Welsh v. Railroad, 81 Mo. 466;

Dunkman v. Railroad, 95 Mo. 232; Bunyan v. Railroad, 127 Mo. 12; Guenther v. Railroad, 108 Mo. 18; Rine v. Railroad, 88 Mo. 392; Frick v. Railroad, 75 Mo. 595; Kelley v. Railroad, 75 Mo. 138; Jager v. Railroad, 114 Mo. App. 10; Gass v. Railroad, 57 Mo. App. 574. (4) From whatever point of view this case may be considered it was clearly error to excuse defendant for its total disregard of statutory requirements and its gross negligence, and declare as a matter of law, notwithstanding defendant's disregard of statute and inexcusable negligence, that the negligence of this child deprived plaintiffs of the submission of this case to the jury. This is peculiarly a case for the jury. Cases supra.

*J. L. Minnis* and *Sebree, Conrad & Wendorff* for respondent.

(1) Defendant was not guilty of any negligence. The whistle was blown at the whistling post eighty rods from the crossing and the bell kept ringing from within five or six hundred feet of the crossing until the crossing was reached. The engineer swears positively that the whistle was blown at the whistling post eighty yards from the crossing where the accident happened and the bell was kept ringing from a point five or six hundred feet from the crossing until the crossing was reached. All the other witnesses testified that they did not hear the whistle nor the bell. The uncontradicted positive testimony of the engineer, with only the negative character of testimony of all the other witnesses, must be regarded as true. Henze v. Railroad, 71 Mo. 638; Sullivan v. Railroad, 72 Mo. 195; McGrath v. Railroad, 197 Mo. 105; Isaacs v. Skrainka, 95 Mo. 523. (2) Deceased's negligence in not looking and listening for the train before attempting to cross the railroad track contributed to his death and precludes plaintiffs' recovery in this case. Walker v.

Railroad, 193 Mo. 453; Porter v. Railroad, 199 Mo. 82; Mockowik v. Railroad, 196 Mo. 550; Sanguinette v. Railroad, 196 Mo. 446; Green v. Railroad, 192 Mo. 131; Schmidt v. Railroad, 191 Mo. 215; Deschner v. Railroad, 200 Mo. 325. (3) Deceased's age—he was thirteen years one and one-half months old—did not excuse him for his negligence in failing to look and listen for the approaching train before attempting to cross the railroad track. The evidence clearly shows without dispute that he thoroughly understood the danger of trains and was usually very cautious about them. Deschner v. Railroad, 200 Mo. 325; Walker v. Railroad, 193 Mo. 481; Payne v. Railroad, 136 Mo. 593; Graney v. Railroad, 157 Mo. 678. (4) If deceased had not the capacity to appreciate the danger of attempting to cross a railroad track without first looking for a train, plaintiffs knew that fact, and were guilty of negligence in sending deceased across the track at train time, and therefore cannot recover in this case. Wiese v. Remme, 140 Mo. 299; Koons v. Railroad, 65 Mo. 592. (5) Even if defendant had been guilty of negligence, yet since deceased's negligence contributed to the injury, plaintiffs cannot recover. Payne v. Railroad, 136 Mo. 593; Porter v. Railroad, 199 Mo. 97; Green v. Railroad, 192 Mo. 131; Clancy v. Railroad, 192 Mo. 615.

LAMM, J.—Plaintiffs, the parents of Oscar McGee, a minor killed by one of defendant's passenger engines at a railroad crossing, known as Long's crossing, in Daviess county, grounding a cause of action on the negligence of defendant's train servants, sue to recover the statutory penalty of $5,000.

At the close of plaintiffs' case in chief, the trial court gave defendant an instruction in the nature of a demurrer to the evidence. Thereat, they took a vol-

untary nonsuit with leave.    Failing to get it set aside on motion, they appeal.

The petition counts on the following specifications of negligence, viz.:    (1)  A negligent failure to give the statutory crossing signals of bell or whistle.  (2) Running its train at a reckless and dangerous rate of speed, environment considered.    (3)  A negligent failure to avoid the death of Oscar after defendant's servants running the locomotive and train saw, or by the exercise of ordinary care and diligence could have seen, him in peril in time to have saved his life.

The answer is a general denial coupled with two allegations of negligence, viz.:    One, an averment of Oscar's contributory negligence in attempting to cross defendant's railroad track without looking or listening for the approach of a train—the other, the negligence of plaintiffs in permitting Oscar to so cross defendant's track.

The reply was conventional.

The case on the facts is this:

Oscar McGee was the rise of thirteen years in age.    Plaintiffs' counsel submit the case to us on the theory that he was a bright boy for that age and endowed with all his natural senses.    He was shown to be familiar with railroad tracks and the running of trains.   His father on cross-examination was asked: "Q.  What caution did you give your boy about the train?"  His answer was:   "Well, I did not give him any particular caution, for I never knowed him to ever fall or play or stay around here, because he was very careful and scary of a train; it was hard to get him to go about a train, something that he never did to my knowledge and I never thought to caution him." His mother on cross-examination was asked:    "Q. What warning did you give him about the train, if any?"   Her answer was:   "I did not give him none for he did not need it; he was afraid of a train; he

never bothered with the train, and he never went about them; . . . . he was the most cautionate boy about a train, I reckon, that ever was, pretty near it, and I did not think to give him any.''

Long's crossing is in the country. There, defendant's track runs north and south, cutting the Gallatin and Jameson public dirt road at right angles and very nearly on a grade—the dirt road elevated a trifle to make it. The situation at Long's crossing is but dimly outlined in the testimony. As well as we can make out, at a distance north of the crossing was a hill or ridge on the east side of the track—the latter hugging the foot of the hill and leaving a flat country on the other side, at that time a cornfield. We infer, too, that the track cut into the foot of this hill (broken by draws) at intervals north of the crossing. Whether there was a cut at the crossing is not clear, but we infer there was none. However that be, because of the hill towards the north and because of a curve, or curves, in the track to the north, a person standing at the east rail could see four hundred feet up the track and standing six feet east of the rail such person could see from forty to one hundred feet up the track.

The McGees lived north of the Gallatin and Jameson road. From their house to the front gate on the road side, it was twenty or thirty feet. From this front gate west to Long's crossing was, say, one hundred feet, and this front gate was, say, fifteen or twenty feet higher than the railroad track. The McGees were renters and had lived in that house but a week prior to the accident. They used the time schedule of trains to correct their clock and the family were familiar with the time of regular trains. The train in question was a regular passenger train running south and due at Gallatin south of the crossing at 4:03 p. m., making it due at the crossing at about 4 o'clock. Plain-

tiffs introduced testimony tending to show that on the 3rd day of November, 1903, it was running ten or fifteen minutes late. But they also put on witnesses who testified it was on time there on that day. Its schedule time was twenty-eight miles an hour, but this included stops. The testimony shows it was running from forty-five to fifty miles per hour at the crossing at the time of the accident. There was evidence put in by plaintiffs from witnesses, paying no particular attention and who do not put themselves in a situation to hear distinctly, that they heard no crossing signals. By other witnesses, differently situated, they showed there were no crossing signals heard. One witness testified positively on that score. He puts himself about fifty yards from the whistling-post, was cutting corn in said cornfield and was in a situation to hear and notice. But the plaintiffs also introduced a witness, the locomotive engineer, who testified he gave the crossing signals in the proper place and in due time as prescribed by statute and, not only so, but that the fireman was ringing the bell as the train approached for the prescribed distance.

On said date Oscar was with his father at the barn repairing a log wagon. At a certain time the father told him to go to the cornfield with a message to his elder brother, Aubray, there cutting corn. To carry it, he went from the barn to the house, from the house to the front gate and there turned west on the dirt road towards the crossing. Hearing of his errand, his brother, Roy, aged eleven, got leave from the mother to go along. There were two eye-witnesses to the accident, the engineer and Roy. The engineer testifies he was at his post of duty looking out ahead and that his first glimpse of Oscar was as the boy got almost to the west rail and the "instant" the pilot picked him up. Another step or so would put him safe. Roy testifies that as he got to the

front gate and had taken two or three steps following Oscar he heard the rumble of the approaching train. Attracted by it, he looked and saw the smoke stack. He stopped and called to Oscar who was eight or nine steps from the track, and a dozen or so ahead of him. Oscar, heedless of the call (quoting from Roy's testimony) *"just kept going; did not look no way; just kept going the way he started* . . . he went out towards the railroad and it looked like the train cut him right off from me." Referring to his seeing Oscar and the smoke stack and making the call, he was asked: "Q. Well, was he standing or moving?" His answer was, "I could not tell you; I think he be kind a moving." Asked how fast he was moving, he replied: *"Why, he was going a little faster than a common walk* . . . I spoke to him and told him that the train was coming and he did not pay no attention to me." Roy thought Oscar got safely over and went his way to the brother in the cornfield. After the train passed, Roy went to the cornfield expecting to find Oscar and did not know he had been killed until informed of it by his father. The train stopped about six hundred feet south of the crossing. There was testimony that the engineer, on the right or west side of the cab, could see an object on the crossing coming from the east, as Oscar came, when he (the engineer) was about fifty feet away and that the fireman could see such an object three or four hundred feet. That with a mere service application of air, a train of the length, equipped and going as that one, could be stopped in six hundred feet, and in five hundred feet in an emergency. There was testimony that the speed of that train could be reduced a half or not quite a half in running three hundred feet. There was no testimony directed to showing how much the speed could be reduced in running fifty feet.

I.	On such record the peremptory instruction cannot be sustained on the theory that plaintiffs' testimony made out the defense pleaded in the answer of contributory negligence on the part of Oscar's parents in permitting him to go upon the track. If there was any evidence at all (which we greatly doubt) tending to show their contributory negligence, that issue was clearly one of fact for the jury, and not a question of law for the court on the record before us.

II.	It has always been held by this court that in the country, between stations, away from congested populations, it is not negligence for passenger trains to run at a rapid speed over road-crossings. If this long-established and well-known interpretation of the law was not satisfactory to the Legislature, it must be conclusively presumed that it would have taken up the question of rapid transit under the modern demands of commerce and established a legislative rule regulating train speed at country crossings. The allegations of the petition in that regard stated no cause of action under this proof.

III.	Nor, on this record, did plaintiffs make a case for the jury on the allegation in the petition invoking the humanitarian rule or the last clear chance doctrine, viz.: that defendant's servants saw or by the exercise of due care might have seen Oscar McGee in peril in time to have thereafter saved his life by the exercise of such care. This is so because that doctrine seizes the actual facts as they exist. It proceeds, for instance, on the assumption in this case that Oscar was negligent in getting on the track without looking or listening, and that defendant's servants were negligent in not giving the crossing signals. It assumes the actual rate of speed the train had. Assuming all those things, then, out of the law's tender regard for life and limb the doctrine

is evolved that defendant's servants owed the duty
to have saved his life if they saw him, or might have
seen him, in peril at the crossing in·time to have done
so.

Learned counsel, as we see it, do not contend that
the engineer was negligent in not stopping the train
and that the humanitarian rule applies to his conduct
taken by itself.    Nor could they well do so; for the
uncontradicted testimony is that the boy appeared in
his line of vision not more than fifty feet from the
pilot.    Oscar had then passed over the east rail and
was almost to the west rail.    Obviously the die was
cast and neither distress whistle nor emergency brake
would have saved the situation.    The engineer describ-
ed it by saying that he only saw Oscar at the ''instant''
the pilot picked him up.    A train going fifty miles an
hour would cover fifty feet in less than one second,
hence the engineer's use of the word ''instant'' is jus-
tified.    It was literally an *instant;* and before eye
could see, brain conceive and hand execute that dis-
tance would have been covered by the locomotive.

Counsel, however, lay stress upon the fact that
the fireman could see the boy three hundred or four
hundred feet away.    Relying on the. theory that the
fireman was negligent, they argue that they had a case
for the jury if the train could have been brought to
a standstill or slowed down in that distance so that
the boy might have escaped.    There is no testimony
the fireman actually saw Oscar that distance away, or
at all.    A locomotive fireman has manifold duties to
perform and no case has come to our attention going so
far as to hold that the duty of the fireman is to glue
his eyes on the track ahead of the engine at every
single instant of time.    The law could not well be writ-
ten that way.    We know a locomotive fireman does
not run the locomotive.    We know such to be the en-
gineer's duty and that he alone holds the mechanical

appliances to that end within his reach and dominion. The most the fireman could do would be to lift his voice to the engineer and tell him of the danger. Allowing an appreciable time for the eye of the fireman to see, for his mind to apprehend and for his voice to be heard by the engineer, then, at the rate his train was going, before the engineer could get and act on the information, this train would either cover or nearly cover the entire distance, so that a verdict finding defendant's servants guilty of negligence on that score would stand on mere guess. This train would run four hundred feet in five and one-half seconds. How are those mere pulse beats to be distributed between the engineer and fireman in meting out praise and blame and arriving at actionable negligence? Here are the minds of two men that must grasp an acute crisis after an interchange of intelligence. Courts being eminently practical tribunals in getting at practical and just results in the affairs of men, will it do to chop logic and predicate actionable negligence on subtle reasoning involving metaphysical features and covering an interval of half a second or one or two seconds of time? We think not. Therefore to get to the jury plaintiffs must get their case out of the fog of conjecture and plant it on a basis of fact. This they failed to do on the issue now in hand. Hence the humanitarian doctrine is out of the case. Therefore it was not error to tell the jury so, as, in effect, the mandatory instruction did.

IV. With the contributory negligence of the parents, on the one hand, and the humanitarian doctrine and rapid speed, on the other, out of the case on appeal, a consideration of the remaining assignments of error may proceed on the theory: *First,* that it stands conceded Oscar was killed by defendant's train at a railroad crossing; and, *second,* that the burden was on plaintiffs to show that defendant's servants

were negligent in failing to give the crossing signals. Was there evidence tending to show the latter?

It is a general principle in the law of negligence that plaintiff must show by direct or inferential evidence that the negligence complained of produced the injury sued for.    But this is not so (as presently seen) in crossing cases where there is substantial testimony that the crossing signals were not given.    It is argued on behalf of defendant there is no substantial evidence the signals were not given.    But we do not read the record in that way; because:

Having put in proof by some of their witnesses that the signals were omitted, plaintiffs may not be cast as a matter of law because another witness of theirs, the engineer, testified they were given.    It was the province of the jury to settle that conflict between plaintiffs' witnesses (Knorpp v. Wagner, 195 Mo. 1. c. 661), and the mandatory instruction could not be justified on the engineer's testimony alone. This being so, on demurrer the most favorable view of the testimony must be taken, and we may assume there was evidence tending to show the crossing signals were not given.    If we add to that the conceded fact that Oscar was killed, this state of proof under our statute made out a prima-facie case for plaintiffs. [R. S. 1899, sec. 1102.]    That section contains this clause:    "And said corporation shall also be liable for all damages hereafter sustained at such crossings when such bell shall not be rung or such whistle sounded as required by this section, provided, however, that nothing herein contained shall preclude the corporation sued from showing that the failure to ring such bell or sound such whistle was not the cause of such injury."

Under that statute, plaintiffs were relieved from proof that the failure to ring the bell or sound the whistle was the proximate cause of the injury.    *The statute*

*supplies the causal connection.* In other words, given
proof of a failure to comply with the law and that
injury ensued at the crossing (as here), then the stat-
ute raises a presumption that the injury was the result
of disobeying the statute—that they bore the relation
of cause and effect—and the burden is cast upon the
defendant to show that the failure to give the stat-
utory signals did not cause the injury. [Huckshold v.
Railroad, 90 Mo. l. c. 555-6; Crumpley v. Railroad, 111
Mo. l. c. 157; McNulty v. Railroad, 203 Mo. 475; Green
v. Railroad, 192 Mo. l. c. 143.]

The contention is therefore ruled against defend-
ant.

V.   Though the burden is put by statute on de-
fendant to show that the failure to ring a bell or blow
a whistle did not cause the injury, yet in carrying that
burden defendant need not introduce testimony of its
own to show that a failure to give the crossing signals
did not cause the death of Oscar; for it is settled law
that such fact may appear from plaintiffs' own proof.
For example, plaintiffs' proofs may show that the in-
jured party was guilty of contributory negligence co-
incident and concurrent in time and place with the
negligence of defendant and when that is made to ap-
pear an action cannot be maintained.   [Green   v.
Railroad, *supra.*]   "The rule, however," says THOM-
AS, J., in Crumpley v. Railroad, *supra*, "in regard to
contributory negligence of the injured party remains
the same in this class of cases as in others."

Now, in the case at bar, plaintiffs put in uncon-
tradicted proof from an eye-witness, Roy McGee, that
Oscar in broad daylight walked upon defendant's
railroad track before a rapidly approaching passenger
train without looking and apparently without listen-
ing, when to look was to see and to listen was to hear.

Such conduct in an adult would be held negligence as a matter of law and bar recovery.

But he was not an adult and, at last, the pivotal and sole question in this case has come to be this: Could the court as a matter of law impute negligence to him? Was it for the judge on the bench or for the jury in the box to say he was negligent on the undisputed facts?

VI.    When an issue of fact is framed and put to a jury on the question of the negligence of a minor the general rule is to so frame the instruction as to graduate the degree of care demanded of a child to his age and capacity. That rule requires that a child should be judged as a child and not as a man. But the rule does not mean that the question is always to be submitted to a jury. Children may be declared as a matter of law *non sui juris* at certain tender years and with certain infantile judgments. Then, again, they may be declared *sui juris* as a matter of law when their age, capacity and the circumstances under which they act are all considered. It may be taken as the most enlightened and accepted doctrine in the case of infants that generally the question of their contributory negligence is one for the jury. But it is not the accepted doctrine that it may not under given circumstances be dealt with as a matter of law. If the facts are few and simple, devoid of confusion and complications, and if the danger to be avoided is so apparent as to be within the easy comprehension of a boy of thirteen years of age, if that boy is shown to be of bright intelligence and of a judgment training him to caution and care in the matter in hand—we say all these things being admitted, then there is no reason why the judge on the bench may not as a matter of law under the facts of the given case declare there could be no two opinions among reasonable men about the negligence of such a boy measured by the standard

McGee v. Railroad.

of an ordinarily prudent boy.    A boy of that age knows as well as an adult that a locomotive must follow the rails and that it cannot run around him or avoid striking him if he is on the track and gets in its way.    That a railroad track is a sign of danger within the easy comprehension of a child at the age and capacity of Oscar has often been held.    That the eye must be used to see and the ear used to hear and thereby avoid danger is as much a part of the wisdom of an average boy of that age as of an adult.    He knows as well as an adult that fire will burn, a wasp sting, water drown or a locomotive kill, or cold freeze, and may be held to know as a matter of law.    Here was a single railroad track.    There was no confusion of tracks, switches or circumstances to mislead, no other trains with puffing engines and ringing bells to bewilder.    There was nothing to distract the attention of Oscar, no excitement to provoke inadvertence.    Being on foot and master of his own volition, he walked quickly into death without listening and without looking.    We say this is what he did, because it is the most favorable view to take for appellants.    If we take the other view, viz.: that he looked and saw or listened and heard the oncoming train, or heard Roy's call, then appellants' case fails at once, for in such a case the bell or whistle filled no office.    Their office was to warn.    Why warn one who sees or hears and, hence, already knows?    No two negligence cases are alike and in writing the law of negligence care should be taken to avoid generalization by general rules.    This is so because the law of negligence adjusts itself to do justice in every particular case *according to the circumstances.*    Confining what we have to say to the case at bar, we are of the opinion that the trial court did not err in taking it from the jury.

It is not necessary to overload the case by excerpts from opinions.    It is sufficient to say that the

propositions advanced are sustained by many cases. For instance, Holmes v. Railroad, 190 Mo. l. c. 105, *et seq.*, and authorities cited; Ridenhour v. Railroad, 102 Mo. l. c. 286, *et seq.;* Spillane v. Railroad, 135 Mo. 414; Graney v. Railroad, 157 Mo. 666; Walker v. Railroad, 193 Mo. l. c. 431, *et seq.;* Deschner v. Railroad, 200 Mo. l. c. 328, *et seq.;* Payne v. Railroad, 136 Mo. 562; Berry v. Railroad, this volume, page 593; Mann v. Railroad, 123 Mo. App. l. c. 491, *et seq.*

We find no fault with the ruling on the mandatory instruction. It can be sustained on the ground of contributory negligence of Oscar deduced from the evidence of plaintiffs' witnesses.

Let the judgment be affirmed. It is so ordered. *Valliant, P. J.,* and *Graves, J.,* concur; *Woodson, J.,* dissents in an opinion filed.

## DISSENTING OPINION.

WOODSON, J.—I dissent from the opinion in this case for the reason that it overlooks the rule that, in asking a demurrer to the evidence or a peremptory instruction to find for the defendant, the instruction admits as true every fact which the evidence in the case tends to prove in favor of the plaintiff. With that rule in mind let us see if the deceased boy was guilty of such negligence that a court should declare as a matter of law plaintiffs cannot recover.

The *opinion states* that the evidence shows that one standing six feet east of the track could see the train approaching from forty to one hundred feet. That being true, then the jury would have been warranted in finding that the boy could not have seen the train for a greater distance than forty feet before it reached the crossing.

The opinion also states that the engineer testified the train was running about fifty miles an hour,

or fifty feet a second; and the brother of deceased, who was an eye-witness to the accident, testified that deceased was going a little faster than a walk. This court knows, as well as the trial court, or anyone else for that matter, that an ordinary person will walk about four miles an hour. If we concede deceased was going only four miles an hour when struck, then he was traveling only one-twelfth as fast as the train was running, which was fifty feet a second, which would be one-twelfth of fifty feet or four and one-sixth feet a second. Now, if the deceased was within six feet of the track when he could first see the train, which was only forty feet away, then in less than one and a half seconds he would have stepped upon the track at the rate he was walking.

This is putting the evidence in the most favorable light for the defendant, but under the instruction it is our duty to look at it in the most favorable light for the plaintiffs; but instead of doing so, let us view it in the most unfavorable light. Suppose, instead of deceased being able to see the train approaching only forty feet away when he was within six feet of the track, he could have seen it one hundred feet away, as some of the testimony tended to show. At that rate the train would have reached the crossing in exactly two seconds, and the deceased would have walked about nine feet, which would have placed him beyond the center of the track. The evidence is undisputed that just at the very instant he reached the center of the track the engine struck and killed him.

Now, we have the situation in the most favorable and most unfavorable light to plaintiffs; and I submit that to declare as a matter of law that a boy of thirteen years of age by not stopping and avoiding coming in contact with the train after he was within six feet of the rail and less than four feet of the line of the passing train is guilty of contributory negli-

gence, is carrying the doctrine of contributory negligence to an extreme not heretofore announced by this court, or supported by the text-writers upon that subject.

He was but a lad of tender years, with no cares or responsibilities resting upon his shoulders, unmindful or forgetful perhaps of the railroad and the train, and doubtless with his mind absorbed with the errand he was running for his father to his brother, approached at a brisk walk a railroad, the view of which was so obstructed he could not see the approaching train until he was within six feet of the track, and doubtless the hill which obstructed his view muffled its sound so that he did not see or hear it, and, consequently, apprehended no danger, but all at once the train hove in sight, approaching him with lightning-like speed, without warning. Under these conditions he had no time to realize the jeopardy he was in, much less to extricate himself from the imminent and impending danger that threatened him. That situation and danger caused by defendant's negligence would have naturally frightened and confused boy or man to such a degree that he should not be judged by the ordinary rules of contributory negligence, but should be required to use such care and caution only that a person in the same situation would have done. [Siegrist v. Arnot, 86 Mo. 200.] Especially that should be the rule when applied to boys no older than this one was.

In my judgment the evidence made a clear case for the jury, and for that reason in my opinion the action of the court in giving the demurrer to the evidence was reversible error.